J-A09032-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ADOPTION OF:  S.A.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  A.M.K., MOTHER | : | No. 1621 MDA 2016 |

Appeal from the Decree September 2, 2016
In the Court of Common Pleas of York County
Orphans' Court at No(s):  2014-0180

BEFORE:   GANTMAN, P.J., SHOGAN, J., and OTT, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED APRIL 19, 2017**

Appellant, A.M.K. ("Mother"), appeals from the decree entered in the York County Court of Common Pleas Orphans' Court, which granted the petition of the York County Office of Children, Youth & Families ("Agency") for involuntary termination of Mother's parental rights to her minor child, S.A.K. ("Child").  We affirm.

In its opinions, the Orphans' Court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Mother raises one issue for our review:

> WHETHER THE [ORPHANS'] COURT ABUSED ITS DISCRETION IN INVOLUNTARILY TERMINATING THE PARENTAL RIGHTS OF MOTHER WHEN MOTHER, SINCE THE PREVIOUS TERMINATION ORDER, HAD ACHIEVED, INDEPENDENTLY AND WITHOUT THE HELP OF AGENCY, THE GOALS OF STABLE HOUSING, STABLE EMPLOYMENT AND MENTAL STABILITY?

(Mother's Brief at 7).

Appellate review of termination of parental rights cases implicates the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

*In re Z.P.*, 994 A.2d 1108, 1115 (Pa.Super. 2010) (quoting *In re I.J.*, 972 A.2d 5, 8 (Pa.Super. 2009)).

> > Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> *In re B.L.W.*, 843 A.2d 380, 383 (Pa.Super. 2004) (*en banc*), *appeal denied*, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).
>
> > Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by the finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.
>
> *In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa.Super. 2002) (internal citations and quotation marks omitted). The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super. 2002). We may uphold a termination decision if any proper basis

exists for the result reached. ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*). If the court's findings are supported by competent evidence, we must affirm the court's decision, even if the record could support an opposite result. ***In re R.L.T.M.***, 860 A.2d 190, 191-92 (Pa.Super. 2004).

***In re Z.P., supra*** at 1115-16 (quoting ***In re Adoption of K.J.***, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008)).

Agency filed a petition for the involuntary termination of Mother's parental rights to Child on the following relevant grounds:

**§ 2511.  Grounds for involuntary termination**

**(a)  General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\*     \*     \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*     \*     \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of

- 3 -

the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b)  Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8), and (b).

"Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." **In re Z.P., supra** at 1117.

Initially, the focus is on the conduct of the parent.  The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of…her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs

and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (internal citations omitted).

The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Id.* at 340. The fundamental test in termination of parental rights under Section 2511(a)(2) was long ago stated in the case of *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975), where the Pennsylvania Supreme Court announced that under what is now Section 2511(a)(2), "the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

"Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the

needs and welfare of the child." *In re Z.P., supra* at 1118.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.,* 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. *Id.* Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services. *In re Adoption of T.B.B.,* 835 A.2d 387, 396 (Pa.Super. 2003); *In re Adoption of M.E.P., supra*.

Under Section 2511(b), the court must consider whether termination will meet the child's needs and welfare. *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The

court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.* Significantly:

> In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship.
>
> When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation.

*In re Z.P., supra* at 1121 (internal citations omitted).

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and have…her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super. 2001). This Court has said:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert [herself] to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of…her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of…her child is converted, upon the failure to fulfill…her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *Id.* at 856.

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinions of the Honorable Andrea Marceca Strong, we conclude Mother's issue merits no relief. The Orphans' Court opinions comprehensively discuss and properly dispose of the question presented. (*See* Orphans' Court Opinions, filed September 2, 2016, at 21-40, and October 28, 2016, at 2-7, respectively) (finding: Child was placed in foster care in August, 2013, due to Agency's concerns regarding Mother's

- 8 -

mental health, instability, lack of housing, employment, and drug use; Mother's mental condition rendered her incapable of appropriately parenting Child; Mother refused to acknowledge her mental health concerns and completely abandoned treatment, despite credible testimony that indicated Mother required ongoing therapy; Mother is unlikely to remedy her mental health condition in foreseeable future; throughout proceedings, Mother failed to maintain suitable housing long enough to achieve reunification and has lived in 14 different places since Child's adjudication; despite significant tax refund and assistance from Agency, Mother refused to prioritize housing for Child, and she is unlikely to maintain stable housing for Child in reasonable timeframe; Mother had been employed for 10 weeks at time of July, 2016 hearing, but was unemployed for 8 months prior to her new job; Mother could not produce pay stubs to establish income at any other time during proceedings; Mother is unable to support Child financially because she cannot properly manage her money or maintain budget; Mother consistently tested positive for amphetamines and marijuana since Child was removed; Mother demonstrated she is unwilling to cooperate with services designed to assist her in reunification with Child; Mother was not credible witness and has not been forthcoming with information with court or Agency; Child has lived in foster care since his adjudication because Mother remained incapable of providing Child with essential parental care, control, and subsistence necessary for Child's well-being; Child has lived with foster mother for

majority of his life; Child has stronger bond with foster mother than with Mother, and calls foster mother "mommy;" foster mother provides Child with safe, stable environment, which Mother cannot offer Child; foster mother cooperated with Agency and facilitated ongoing biological family contact with Child; foster mother acts with Child's best interests in mind; termination of Mother's parental rights was proper pursuant to Sections 2511(a)(2), (a)(5), (a)(8), and (b)). Accordingly, we affirm on the basis of the Orphans' Court's opinions.[1]

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/19/2017

---

[1] On April 3, 2017, Mother filed an application to correct the original record in the above-captioned case, at Orphans' Court No. 2014-0180. In the motion she requests incorporation of a transcript from the Status Hearing held on July 18, 2016, along with the Status Review Order and the Updated Family Service Plan in the juvenile dependency action, at No. CP-67-DP-0170-2013. The proposed supplement appears to be from a separate case at another docket number, and Mother fails to explain its relevance to the instant appeal. Accordingly, we deny the motion to supplement the certified record as proposed, but without prejudice to Mother to seek that relief before the appropriate division of the Orphans' Court.

**IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA**

In Re: Adoption of          :

    S. K.              :      **No. 2014-0180**

          **A Minor**    :      **Termination of Parental Rights**

**APPEARANCES:**

Martin Miller, Esquire                David Worley, Esquire

Office of Children, Youth & Families      *Guardian Ad Litem*

Edward LeCates, Esquire

For Mother,  A. M. K.

## ADJUDICATION

Presently before the Court is the Petition for Involuntary Termination of Parental Rights of A. M. K. to the above-captioned minor child filed on December 16, 2014. Evidentiary hearings were held on March 12, 2015 and March 20, 2015. The Final Decree terminating Mother's parental rights was issued on May 8, 2015. Mother then filed an appeal to the Pennsylvania Superior Court, which vacated the decree terminating her parental rights. Following a remand by the Superior Court on May 17, 2016, an evidentiary hearing was scheduled for July 5, 2016. Evidence was presented on that date, and the Court scheduled an additional continued hearing to permit Mother to present further evidence on July 7, 2016. Evidence was also presented on that date.

Based upon the evidence presented at the hearings on July 5th and July 7th, 2016, and upon consideration of the record, the Petition for Involuntary Termination of Parental Rights of Mother to S. K. is **GRANTED** for the reasons outlined herein.

1

## FINDINGS OF FACT

1. The record docketed at CP-67-DP-170-2013 with the Clerk of Courts in the Court of Common Pleas in York County was incorporated into the Orphans' Court record docketed as above with no objection.

2. Child (hereinafter "S.K.") was born November 2011.

3. A.M.K. (hereinafter "Mother") is the natural mother of S.K.

4. D.G. (hereinafter "Father") is the biological father of S.K. Father's parental rights have previously been terminated by decree entered on May 8, 2015; the reasons for that termination were set forth in a previous Adjudication, which was not appealed.

5. An Application for Emergency Custody in the related Dependency action was filed by the Agency on August 5, 2013. The allegations included:

   a. On or about August 3, 2013, the Agency received a referral regarding the minor child, S.K., due to allegations of homelessness and lack of supervision.

   b. Allegations received were that the mother and the minor child were "living out of" a car; there were also two small dogs inside the vehicle.

   c. The car was parked on the street by Albemarle Park.

   d. The mother requested a woman to assist her in "jump starting" the vehicle.

   e. The woman requested that her son assist and he drove over to the mother's vehicle.

   f. The man's dog jumped out of his car and was hit by another vehicle.

   g. The man and the mother got into his car and drove the man's dog to a veterinarian; the mother left her son and the two small dogs in the car.

2

h. The woman stood by the car and watched the minor child.

i. Upon the mother's return to her vehicle, she was allegedly acting and speaking erratically [sic].

j. The York City Police were contacted and responded to the scene.

k. The mother stated that the father was a *D. G.,* , however, was unable to provide his address or telephone number.

l. The mother was transported to the York Hospital Psychiatric Unit where she was admitted on a 302 commitment.

m. The York City Police Department took twenty-four hour protective custody of the minor child on August 3, 2013.

n. On August 4, 2013, the Court was contacted and verbally awarded temporary legal and physical custody of the minor child, S.K, to the Agency for continued foster-care placement.

6. An Order to Reaffirm the Verbal Order, Schedule Protective Custody Hearing, and Summons was entered on August 5, 2013.

7. A Shelter Care Order was filed on August 13, 2013. Legal and physical custody of S.K. were awarded to the Agency. S.K.'s placement in foster care continued. Mother was afforded supervised visitation with S.K. twice per week.

8. A Dependency Petition was filed regarding S.K. on August 14, 2015. The allegations set forth in the Dependency Petition were consistent with the allegations in the Application for Emergency Custody, but included several additional averments, including:

3

a. The mother was discharged from York Hospital on August 7, 2013 and has been living with a friend in York, Pennsylvania but cannot continue there because of her dogs.

b. The mother indicated she is in the process of securing an apartment from a friend; she will be staying with her dogs in a hotel until she secures that apartment.

c. The mother allegedly has mental health issues and is prescribed Carbamazepine and Fluphenazine.

9. Mother requested county-paid court-appointed counsel on August 19, 2013. In an Order filed on August 20, 2013, the Court appointed Attorney Gillian Woodward to represent Mother. At the time of the October 7, 2013 expedited review, Mother indicated a desire to secure alternate counsel. Attorney Woodward agreed to remain Mother's counsel until new counsel entered an appearance or Mother executed an entry of appearance form.

10. An Order of Adjudication and Disposition was entered on August 20, 2013 after consideration of the petition and by the agreement of all parties. The contents of that Order are hereby incorporated as if set forth more fully herein. The findings of the Court in that Order include, but are not limited to:

a. Mother is returning to the home of her husband, but does not have stable housing at this point. She has recently been released from York Hospital after a 302 admission. Father acknowledges that he is not a resource for the child at this time. He does admit to paternity.

4

b. S.K. is to be placed, by the agency, in foster-care placement. S.K.'s placement is the least restrictive alternative that meets the needs of the child and there is no less restrictive alternative available, in that: neither parent is a resource for the minor child at this time and no relative has yet been approved, whereby foster-care placement is the least restrictive alternative available.

c. Maternal grandmother,                  , may also have supervised visits with the view toward possible placement of the child with the maternal grandmother.

d. The child is safe in the current placement setting.

e. The current placement goal for the Child is return to parent or guardian.

f. The Court specified the following tests to occur: random drug and alcohol screens of parents and maternal grandparents

g. Legal and physical custody of the minor child, S.K., shall continue in the Agency for continued foster-care placement until further review for family placement.

11. As part of the Court-Ordered Services/Conditions appendixed to the August 20, 2013 Order, the Court ordered certain directives, which included but were not limited to the following:

a. Mother shall maintain safe, stable and appropriate housing for the minor(s) and shall maintain stable, lawful income to support the minor(s), and shall provide proof of such to the Agency.

b. Mother shall cooperate in obtaining a psychological evaluation which shall be performed by agreed upon evaluator or another appropriate organization or

5

evaluator. The named person(s) shall contact the designated evaluator, or an appropriate organization or evaluator approved by the Agency to do the evaluation, within 10 days of this date, and the evaluation shall be completed, and the results made known to the Agency within 60 days of today's date. The named person(s) shall follow through with any recommendations made as a result of any evaluation conducted in this matter.

c. Mother shall attend counseling sessions with Wellspan Behavioral Health at Edgar Square or another qualified counselor.

d. Mother shall cooperate with the following services: in-home team, Justice Works.

e. Supervised visitation at the Agency between S.K. and Mother from 9:00 a.m. to 11:00 a.m. on Tuesday and Thursday. Father shall contact Agency to schedule his visit.

f. Mother will cooperate and comply with the recommendations made upon discharge from Wellspan Crisis.

g. Parents shall execute an acknowledgement of paternity.

12. A 45-Day Expedited Review occurred on October 7, 2013. The findings made by the Court have been incorporated as if set forth more fully herein.

13. By November 13, 2013, Mother was exercising three visits per week. At that time, the Court approved partially unsupervised contact.

14. Mother requested assistance from CPC.[1] She was denied assistance.

---

[1] CPC is the Community Progress Council. The Court is familiar with this community program that promotes

6

15. A Permanency Review hearing originally scheduled for January 21, 2014 was continued until January 29, 2014 at Mother's request. She requested the continuance in order to obtain alternative counsel and give the new counsel the opportunity to review the case.

16. A Permanency Review Order was entered on January 29, 2014. In said Order, the Court made various findings and directives. The Order is incorporated as if set forth more fully herein. The Court's findings included, but were not limited to:

    a. The placement of the child continues to be necessary and appropriate.

    b. There has been minimal compliance with the permanency plan as to the mother.

    c. Mother has made minimal progress toward alleviating the circumstances which necessitated placement.

    d. The current placement goal for the child is return to parent or guardian. The projected date by which the goal for the child might be achieved is undetermined due to lack of progress by his parents. It is hopeful that he can be returned within three to six months, but unlikely in that time. The concurrent placement plan for the child is placement with a fit and willing relative.

    e. Legal and physical custody shall remain with the Agency.

    f. Placement of the Child remains in foster-care placement with Christina Brooks.

17. As part of the Court-Ordered Services/Conditions appendixed to the January 29, 2014 Order, the Court ordered certain directives, which included but were not limited to the following:

---

self-sufficiency for low- to moderate-income residents of York County. CPC provides emergency assistance with food, heat, and other basic needs, as well as assistance with housing.

7

a. Mother shall maintain safe, stable and appropriate housing for the minor(s) and shall maintain stable, lawful income to support the minor(s), and shall provide proof of such to the Agency.

b. Mother shall attend counseling sessions. The counseling shall be Individual Counseling.

c. Mother shall cooperate with Justice Works.

18. At the January 29, 2014 Permanency Review hearing, a Mental Health Evaluation Report dated January 25, 2014 was entered as Mother's Exhibit 1. In the report, which was drafted by Deborah Hill and based on two appointments with Mother where Mother self-reported, Ms. Hill relayed that Mother's stressors were stated as: severe, lost custody of child, legal issues, new job, unstable housing, and family of origin conflict. Ms. Hill recommended the following course of treatment: (1) continued tri-monthly medication management with her primary care physician; (2) continue counseling to improve personal stability by learning and using self-evaluation techniques to improve judgment making skills and improve quality of life through employment, stable housing and transportation; and (3) continue to cooperate and work toward completion of Children and Youth goals in order to regain custody of her son.

19. It was additionally reported that Mother disclosed she was not taking her prescribed medication, though she was testing positive for amphetamines. Mother failed to attend a medication check appointment scheduled at Edgar Square, despite the recommendation to do so by Ms. Hill.

8

20. A Status Hearing Order was entered on April 21, 2014. Its contents are incorporated as if set forth more fully herein. Mother struggled to maintain housing and employment. Additionally, Mother was not arriving timely to visits with S.K., as well as other court proceedings. Finally, Mother did not complete a budget with or without the assistance of the team. Despite securing a significant tax refund, she did not utilize the funds to secure housing.

21. On June 20, 2014, Mother entered her appearance as a self-represented party.

22. A Permanency Review Order was entered on June 23, 2014. In said Order, the Court made various findings and directives. The Order is incorporated as if set forth more fully herein. The Court's findings included, but were not limited to:

    a. The placement of the child continues to be necessary and appropriate.

    b. There has been minimal compliance with the permanency plan as to the mother.

    c. Mother has made no progress toward alleviating the circumstances which necessitated placement. A recommendation was made to increase counseling and to establish community support.

    d. The current placement goal for the child is return to parent or guardian. The projected date by which the goal for the child might be achieved is undetermined due to lack of progress by his parents. The concurrent placement plan for the child is placement with a fit and willing relative. The permanency plan developed for this child, dated January 29, 2014 is appropriate and feasible except that it shall be modified or supplemented as follows: Agency to explore permanency options for

9

the child, including change of the concurrent goal to adoption given the lack of progress by the parents and failure of any viable family to come forward to be a resource for the child. Although the maternal grandmother has contact, she has indicated that she is not a resource for Child. Father has not had any contact and has not shown any interest in his son.

e. Legal and physical custody shall remain with the Agency.

f. Placement of the Child remains in foster-care placement with Christina Brooks.

23. As part of the Court-Ordered Services/Conditions appendixed to the June 23, 2014 Order, the Court ordered certain directives, which included but were not limited to the following:

a. Mother shall maintain safe, stable and appropriate housing for the minor(s) and shall maintain stable, lawful income to support the minor(s), and shall provide proof of such to the Agency.

b. Mother shall attend counseling sessions. The counseling shall be Individual Counseling.

c. Mother shall cooperate with Justice Works.

24. From January until April 2014, Ms. Hill was meeting with Mother twice per week, though at some point they decreased.

25. A Status Hearing Order was entered on September 22, 2014. Its contents are incorporated as if set forth more fully herein. Mother continued to lack stable housing and employment. Though she continued to have visits, she was frequently late and occasionally missed visits.

10

26. A Blended Perspective Meeting was held November 4, 2014.

27. A Permanency Review Order was entered on December 3, 2014. In said Order, the Court made various findings and directives. The Order is incorporated as if set forth more fully herein. The Court's findings included, but were not limited to:

   a. The placement of the child continues to be necessary and appropriate.

   b. There has been minimal compliance with the permanency plan as to the Mother. She continued to lack stable employment. Though she had stable housing, she stopped paying her rent once the Team closed. She continued to attend visits but was also frequently late for her visits. Mother also refused to cooperate with drug testing and services.

   c. Mother has made minimal progress toward alleviating the circumstances which necessitated placement.

   d. The current placement goal for the child is return to parent or guardian. The projected date by which the goal for the child might be achieved is unlikely given Mother's lack of progress. The concurrent placement plan for the child is adoption. The concurrent goal shall be pursued by the Agency as the primary goal given the lack of progress by S.K.'s parents.

   e. Legal and physical custody shall remain with the Agency.

   f. Placement of the Child remains in foster-care placement with Christina Brooks.

28. As part of the Court-Ordered Services/Conditions appendixed to the December 3, 2014 Order, the Court ordered certain directives, which included but were not limited to the following:

    a. Mother shall maintain safe, stable and appropriate housing for the minor(s) and shall maintain stable, lawful income to support the minor(s), and shall provide proof of such to the Agency.

    b. Mother shall attend counseling sessions...The counseling shall be Individual Counseling.

    c. Mother will provide the Agency with pay stubs, paid rent receipts or escrow account and paid utility receipts.

29. On December 16, 2014, the Petition for Hearing to Change Court-Ordered Goal was filed by the Agency.[2]

30. The Petition for Involuntary Termination of Parental Rights related to both Mother and Father was filed on December 16, 2014.

31. Mother filed a Petition for Leave to Proceed In Forma Pauperis on January 2, 2015. She also filed a document she titled a "Petition/Motion for Appeal of Child Dependency Hearing Held December 3, 2014" on January 2, 2015. A number of documents, some handwritten and others modified by Mother, were attached to the petition. She also filed a "Petition/Motion for the Request of Following Transcripts Listed Below" on January 2, 2015. No Certificates of Service were filed regarding these petitions. The Court later

---

[2] The court need not change the primary goal to adoption in order to terminate parental rights. However, once rights are terminated, the primary goal of reunification is no longer appropriate or feasible, and a new goal would then be established.

12

became independently aware of the existence of the documents. Without notice of the documents, the Court was unable to timely rule upon them.

32. On February 20, 2015, the Court heard evidence on the termination petition as it related to Father.

    a. After the hearing, the Court found that the Agency had established by clear and convincing evidence that Father had failed to perform parental duties on behalf of the child for at least six months prior to the filing of the petition. *23 Pa. C.S. § 2511(a)(1).*

    b. The Court further found that Father's parental rights would best serve the child's needs and welfare. *23 Pa. C.S. § 2511(a)(b).*

    c. A Final Decree terminating Father's rights was issued on May 8, 2015.

    d. No appeal was taken by Father.

33. On March 12, 2015, the Court heard evidence on the termination petition as it related to Mother, as well as a Status Review hearing.

    a. Mother appeared late to the hearing on March 12.

    b. After the hearing, the Court directed that the parties attend a continued hearing on the Petition to Terminate Parental Rights, and change the goal. The Court further outlined specific deadlines to exchange exhibits. The parties were directed to appear at 8:30 a.m. on March 20, 2016.

    c. Mother appeared late to hearing on March 20, 2016.

d. The Court found that Mother had attended most of her visits. Mother had new housing, but unverified employment. Mother had resumed drug testing, and tested positive for THC on two occasions.

e. During the Status Review, the Court found that S.K. was doing well with his foster placement, and there were no concerns. Evidence showed S.K. had formed a bond with his foster mother.

f. After the hearing, the Court terminated Mother's parental rights with a Final Decree and Opinion issued on May 8, 2015.

g. Mother filed her Notice of Appeal to the Pennsylvania Superior Court on June 8, 2015.

h. On May 17, 2016, the Pennsylvania Superior Court remanded the case and vacated the Order Terminating Mother's rights as the Agency failed to file a copy of the notice that provided Mother with notice of her right to be represented by counsel.

i. Upon remand, this Court appointed Attorney Edward LeCates to represent Mother's interests for the rehearing as he had assisted with her appeal.

34. On July 5, 2016, and July 7, 2016, this Court conducted a rehearing on the Petition for Involuntary Termination of Mother's rights. The Court considered the following credible evidence:

a. Throughout the 35 months that S.K. has been dependent, Mother has been noncompliant with the Agency. The main goals established for Mother by the

14

Agency were to secure stable housing, to maintain a stable income, and to work on her mental health. Mother made minimal to no progress.

b. The Agency was aware of the following addresses for Mother since the adjudication of S.K. in August 2013: at an efficiency in the Midway Hotel at 211 North Main Street in York, Pennsylvania from August 20, 2013 until December 12, 2013; with a friend at the Midway Hotel from December 13, 2013 until December 17, 2013; at the Super 8 Motel in York, Pennsylvania from December 18, 2013 until December 22, 2013; with the same friend at the Midway Hotel, Chateau Motel, and the Travelodge at various times between December 23, 2013 until January 2, 2014; with a friend named                on Colony Drive in York, Pennsylvania from January 2, 2014 until February 1, 2014; with a friend named Patricia from February 2, 2014 until March 9, 2014; at the Motel 6 in York, Pennsylvania from March 10, 2014 until April 24, 2014; with a friend from April 25, 2014 until May 15, 2015; at the Motel 6 in York from May 18, 2014 until June 28, 2014; with a friend on Roosevelt Avenue from June 29, 2014 until July 18, 2014; at 339 West Main Street in Dallastown, Pennsylvania from July 19, 2014 until sometime in February 2015, when she was incarcerated; with a friend on East Cottage Place from her release from incarceration until May, 2015. Mother states that she has now been in her current apartment for approximately 7 or 8 months, though the Agency did not find it to be appropriate for S.K., nor have they been able to confirm that she is current on her rent.

15

c. During the Spring of 2015, Mother had no physical address and no verifiable income. She additionally declined to participate in a mental health evaluation as was ordered by this Court that was meant to determine an appropriate diagnosis.

d. Mother received a tax refund of approximately $7,000 in 2014. She testified that she used the money to pay back debts, to fix her vehicle, to buy unspecified things for S.K., and to pay for a hotel room, which she stayed at for at least three months in lieu of securing stable and appropriate housing.

e. Mother has been in her current job approximately ten weeks, and had no employment from May, 2015 until approximately January, 2016. Mother has provided limited paystubs throughout the dependency action. Since January 2016 until July, Mother reported 3 employers. Mother reported that she believed this showed stable employment.

f. Jill Egbert from Families United Network began testing Mother for drugs following a referral on August 20, 2013. Between September 10, 2013 and March 31, 2015, Mother was tested 52 times, and was unavailable 10 times. Mother had 30 positive tests during that time. Her drug tests were positive for amphetamines and marijuana. Mother claimed to have a prescription for Adderall. Mother failed to provide the prescription to the tester or Children and Youth. Because Mother did not always test positive for amphetamines, she was not regularly taking any prescription she might have had for Adderall. Beginning in approximately October, 2014, and continuing until approximately the time that Families United

16

Network closed out, Mother began to decline tests, arguing that it was a violation of her constitutional rights. Mother, by her own admission, continued to utilize marijuana until recently for therapeutic purposes, despite her awareness that marijuana was not legal in Pennsylvania.

g.  Alyson Riedel from Justice Works Youth Care (hereinafter "Justice Works") testified that she received a referral for Mother on August 13, 2013. Justice Works established seven goals for Mother: (1) demonstrate basic economic self-sufficiency; (2) participate in meaningful supervised visits; (3) address mental health needs; (4) seek appropriate means of transportation; (5) demonstrate effective communication skills with the team; (6) demonstrate a basic understanding of household management; and (7) demonstrate basic employability skills. While Mother would have positive visits with the child, she never progressed to unsupervised visitation during the time she worked with Justice Works. Further, Mother failed to obtain consistent employment, she failed to obtain stable housing, she failed to provide any verification of progress with managing her mental health concerns, and she never provided complete and accurate information in order to create a budget. Mother also failed to provide documentation that her vehicle was properly registered, insured, and inspected, and had difficulty with being on time for appointments, including visits with S.K., and failed to keep appointments. The Court notes that Mother again does not have any reliable form of transportation. Mother additionally had a pattern of securing

17

employment prior to Family Resource Meetings, and then losing that employment after the meeting.

h. Tiffany Nulph, also from Justice Works, was a Family Resource Specialist who worked with Mother for approximately six months. Ms. Nulph felt that Mother made minimal progress on getting stable employment, and that she had mental health issues that still needed to be addressed. Further, Ms. Nulph stated that knowing whether income would be reliable was a consistent problem. Ms. Nulph communicated to Mother that she needed to provide proof that she could maintain a secure source of income, and stable housing in order to reunite with the child. Mother failed to appear to approximately four appointments with Ms. Nulph, and never provided any proof of employment beyond receipts created by Mother. The team attempted to assist her to complete a budget, and though she provided a list of expenses, she never provided a list of sources of income with which to pay her expenses. Ms. Nulph also noted that Mother was not always on time for her visits with the child.

i. Justice Works remained open until September, 2014, when they closed out unsuccessfully as they determined that mother could not make any further progress.

j. Mother was involuntarily committed to the York Hospital Psychiatric Unit from August 4, 2013 until August 7, 2013. Mother was diagnosed with possible bi-polar effective disorder, nicotine dependence, cannabis abuse, and a mood disorder. She

was prescribed mood stabilizers, and was recommended to follow up with Edgar Square.

k. Deborah Hill, LCSW, began providing counseling services to Mother in January, 2014. Ms. Hill treated Mother for an adjustment disorder, ADD, and ADHD, but disagreed that Mother had bipolar disorder or a mood disorder. Ms. Hill's treatment plan for Mother included medication, though Mother never verified that she had a prescription.

l. Though Mother was generally cooperative during counseling sessions, there were sessions where Mother was too impulsive and disorganized to focus. Additionally, Mother was supposed to attend sessions once per week, she frequently was late or would cancel. Mother claimed transportation issues for her tardiness or cancellations, though public transportation was regularly available.

m. Though Mother still had need for counseling, she decreased the frequency of her counseling following the termination hearing in March, 2015, and ultimately stopped attending altogether. Mother originally was attending weekly sessions, but only attended ten appointments in 2015, and several were by telephone. Mother has not had a session since December, 2015, despite being extremely distraught at her last session.

n. Mother's diagnoses make her disorganized in her thinking, impulsive, rash, and cause it to be difficult for her to focus. Ms. Hill stated that it would be hard for her to maintain employment, or to get to appointments on time. She further identified

Mother's triggers as her family, communications with the Agency, and the grief over the loss of her son.

o.  Mother reported to Ms. Hill that she was employed and working with the Agency, though at that time, she was not employed, nor was she compliant with the Agency. [3]

p.  Mother incredibly reported currently having stability in her employment, but has had three jobs since January, and her current employment has been for ten weeks.

q.  Since the child was removed, Mother has verified 1 out of 10 jobs[4], and since the child was removed she has had at least fourteen housing changes.

r.  Mother does not believe she has any mental health issues, or any problems that are out of the ordinary. She has discontinued using Adderall because of the inactive ingredients. She does not participate in any type of therapy, nor does she use any type of medication. Mother's testimony lacks credibility as her perception is very skewed toward positive self-assessment, when the factual circumstances do not support her assessment.

s.  When S.K. came into care, he was approximately a year and a half old. He is now more than four and a half years old. He has resided in the same foster home for the entire duration of the dependency proceedings, and now has a stronger bond

---

[3] The Court could not establish a time frame for when this information was divulged, as the testimony and evidence were so nebulous, but the information was not disputed at trial.

[4] At the re-hearing on July 5th, 2016, the Agency testified that it received two pay stubs from Mother's job at            , that Mother had approximately ten jobs, and that the Agency did not receive pay stubs from the other nine jobs. Hr'g Tr. 168: 5-16. (July 5, 2016).

20

with his foster family than with his biological family. He refers to his foster mother as "Mommy", while his bond with his Mother has lessened over time.

## DISCUSSION

The Agency petitioned this Court to involuntarily terminate the parental rights of Mother to S.K. on the grounds presented in 23 Pa. C.S. § 2511(a)(1), (a)(2), (a)(5), and (a)(8) of the Adoption Act. The applicable provisions appear as follows:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with the agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5), (a)(8).

21

To terminate pursuant to Section 2511(a)(1), the Agency need not produce evidence of both an intent to relinquish and a failure to perform necessary duties. *In re C.M.S.*, 832 A.2d 457, 461 (Pa.Super. 2003) (citing *Matter of Adoption of Charles E.D.M., II,* 708 A.2d 88, 91 (Pa. 1998)). Also, the six month time period established by Section 2511(a)(1) should not be "applied mechanically." *In Interest of A.P.*, 692 A.2d 240, 245 (Pa.Super. 1997). It is the role of the court to "examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine it the evidence in light of the totality of the circumstances clearly warrants the involuntary termination." *In re C.M.S., supra.*

The Supreme Court of this Commonwealth has stated:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.
>
> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.
>
> Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life.'

*Id.* (citing *In re Burns*, 379 A.2d 535 (Pa. 1977)). A parent must make a "sincere and genuine effort" to maintain a relationship, use all available resources to preserve the bond, and resist obstacles. *Id.* (citing *In re Shives*, 525 A.2d 801, 803 (Pa.Super. 1987)). A parent who yields to obstacles may forfeit his or her parental rights. *In re Involuntary Termination of Parental Rights to E.A.P., a Minor,* 944 A.2d 79, 83 (citing *In re A.L.D.,* 797 A.2d 326, 340 (Pa. Super. 2002).

(Pa. Super. 2008)

Section 2511(a)(2) focuses on the child's present and future need for proper care. *In re Involuntary Termination of Parental Rights to E.A.P., a Minor*, 944 A.2d 79, 82 (Pa.Super. 2008) (hereinafter "E.A.P.") (citing 23 Pa.C.S.A. § 2511(a)(2); see *In re R.I.*, 361 A.2d 294 (Pa. 1976)). Whether termination is appropriate under Section 2511(a)(2) is not limited to affirmative misconduct. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010)(citing *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). Subsection (a)(2) emphasizes the child's "need for essential parental care, control, or subsistence necessary for his physical or mental well-being." *Id.* (citing *E.A.P.*, 944 A.2d at 82). The Superior Court has further explained the way in which this subsection should be interpreted by this Court:

> Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it. [Id.] Thus, while "sincere efforts to perform parental duties," can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2). [internal citations omitted]. "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." [internal citations omitted].

*Id.* at 1117-18.

Pursuant to Section 2511(a)(8), "...[w]here a parent has addressed some of the conditions that led to a child's removal, but other conditions still exist, a court may find that...section 2511(a)(8) has been satisfied." *In re T.A.C.*, 110 A.3d 1026, 1031 (Pa.Super. 2015) (citing *In re D.A.T.*, 91 A.3d 197 (Pa.Super. 2014)). This Court believes this principle applies also to Section 2511(a)(5).

Once the Court has determined that one or more of the statutory requirements under

23

§ 2511(a) are satisfied, the Court must also engage in an analysis of "[o]ther considerations," pursuant to 23 Pa.C.S.A. § 2511(b):

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). "A parent's basic constitutional right to the custody and rearing of...her child is converted, upon the parent's failure to fulfill...her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006)(internal citations omitted). A child has the right to care in a permanent, healthy, safe environment. See *In re K.M.*, 53 A.3d 781, 792 (Pa.Super. 2012) (citing *In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa.Super. 2006)). "...[A] child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *Id.*

When determining whether termination of parental rights is in the best interest of the child, love, comfort, security, stability and other intangibles must be considered during the inquiry. *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005). The Court must consider that continuity of relationships is important to children and also weigh the safety needs of the child. *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa.Super. 2003)(citing *In the Interest of*

24

*C.S.*, 761 A.2d 1197, 1202 (Pa.Super. 2000)); *In re A.D.*, 93 A.3d 888,^ (internal citations omitted).

The Court is also required to analyze whether a bond exists between the parent and child. The Court must "examine the status of the bond [between parent and child] to determine whether its termination 'would destroy an existing, necessary, and beneficial relationship." *Id.* When a child has a close relationship with a parent, severance of close parental ties is usually "extremely painful." *In Interest of C.S.*, 761 A.2d 1197, 1202 (Pa.Super. 2000) (citing *In re William L.*, 383 A.2d 1228, 1241 (Pa. 1978)). The mere existence of an emotional bond does not preclude a determination that a termination is in the best interests of the child. *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). It is but one of the factors the Court must consider. *In re A.D.*, 93 A.3d at 897. As recently indicated by the Superior Court, the Court is not required to ignore safety concerns simply because a bond exists between the child and a parent. See *In re M.M.*, 106 A.3d 114 (Pa.Super. 2014). The party seeking termination of parental rights must demonstrate the asserted grounds for termination are valid by "clear and convincing evidence." *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa.Super. 2005)). Clear and convincing evidence is defined as evidence "so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa.Super. 2003)).

25

The simple fact that something was stated and was memorialized in the transcript does not mean that the statement itself is considered fact or that the statement is evidence for the Court to consider. The Court is not required to accept all statements as true. The Court "is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the…court is free to believe all, part, or none of the evidence." *In re N.C.*, 909 A.2d 818, 823 (Pa.Super. 2006)(citing *In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa.Super. 2006)). This Court, therefore, considers not only to the evidence presented, but takes into consideration the manner in which that evidence is presented.

The Court did not find Mother to be a credible witness. Mother has not been forthcoming with information with the Court or with the Agency, and has exhibited an unrealistic perception of reality and circumstances. The Court took Mother's lack of credibility into consideration in rendering its determination on the termination petition.

### Section 2511(a)(1)

As was determined in the prior Termination of Parental Rights hearing, no credible evidence was presented to demonstrate that Mother had a settled purpose to relinquish her parental rights to S.K. On the contrary, from the time of the adjudication of S.K. in August 2013, until approximately March, 2015, Mother had continued to perform some parental duties on behalf of her son. Mother kept in contact with S.K., visiting with him approximately three days per week and speaking with him once per week by phone. She attended some of

26

S.K.'s medical appointments and provided him with gifts. It is clear that Mother loves the child, and wants to see him, and would like him returned to her care. The Court finds that although Mother's mental health is a barrier preventing Mother from fully performing her parental duties, at one point she had made an effort to perform some parental duties on behalf of her son. Since the initial termination hearing in 2015, Mother has not had any interaction with S.K., though the Court does note that her rights were terminated. The Agency failed to show by clear and convincing evidence that Mother evidenced a settled purposed to relinquish her claim. Therefore, we decline to terminate on this ground.

### Section 2511(a)(2)

The Court finds that sufficient credible evidence was presented in order for the Court to make a finding that a termination of parental rights under Section 2511(a)(2) is supported by the record. The Court finds that based on her mental condition, whichever diagnosis it may be, Mother is incapable of appropriately and consistently parenting the child safely and that Mother will not remedy the mental condition, as she has chosen not to treat it, get help for it, or even acknowledge it.

The competent evidence presented does not suggest there was a history of repeated and continued abuse of S.K. by Mother or a refusal of Mother to parent S.K. While the credible evidence supports a finding that though Mother has made some steps towards improving her circumstances since the adjudication of S.K., Mother remains incapable of providing S.K. the essential parental, care, control, and subsistence necessary for his mental and physical well-being, as her own mental health concerns cause her to neglect the needs of

27

the child. The credible evidence presented also indicates that the cause of the incapacity will not be remedied by Mother, at least not within the foreseeable future.

Mother has not yet demonstrated an ability to operate in a fashion that would provide a safe environment for S.K. During the course of S.K.'s adjudication, Mother was unable to maintain stable housing. Mother has selected housing that was inappropriate for reunification purposes, including her current apartment, which the Agency found was not appropriate for S.K. Mother has also moved between various non-permanent locations, prioritizing her dogs over establishing stability. Mother testified in the dependency proceeding that she lost at least one motel due to her dogs. Although significant effort was made by Justice Works and the Agency to assist Mother in creating a budget, she remains unable to provide information to establish an income. Mother also, at times, acts erratically, evidenced before the Court during her frequent disruptions and interruptions during various proceedings in the dependency matter. Mother has shown that she is not capable of directing her efforts on obtaining stable, appropriate housing; stable, consistent employment; or treating her physical and mental health concerns.

Further, though Mother has not had an obligation to cooperate with the Agency since the time of the prior termination, she has previously evidenced that she is unwilling to fully cooperate with any services designed to assist Mother in the reunification effort. Though she stated at the rehearing that she is willing to take steps to remedy the conditions, she still has failed to do so, nearly three years after the child was adjudicated. She additionally does not provide any documentation of any steps she claims to have taken. Mother has only ever

28

provided information that suits her, and when it suits her. She does not provide documentation requested at the time it is requested; up until the hearing on July 7, 2016, Mother has repeatedly failed to provide documentation of her prescriptions, employment, income, or housing. Throughout the dependency action, and again during the termination hearing, Mother appeared in Court with some unverifiable and unauthenticated exhibits, without any prior notice to her counsel, or any other party. Many of the documents Mother attempted to submit during the course of S.K.'s dependency were irrelevant and produced at inappropriate times that prevented anyone from being able to authenticate them.

Most importantly to this Court's analysis, though Mother continues to dispute that she has any mental health concerns, her previous counselor, Ms. Hill, diagnosed Mother with adjustment disorder and attention deficit disorder. According to Ms. Hill, Mother's attention deficit disorder is exacerbated in periods of stress. Further, while Mother was previously inconsistent in treating her mental health, she has now completely abandoned any mental health treatment. It is noted that Mother chose to treat with Ms. Hill in lieu of a psychologist or other professional. Ms. Hill testified that she had approximately ten appointments with Mother in 2015, many times only by phone, and that she has not heard from Mother since January, 2016. Additionally, though Mother is prescribed Adderall for her diagnoses, Mother reported that she no longer takes any medication. Maternal grandmother's testimony that Mother no longer needs medication was not persuasive to this Court, nor was it credible, as Maternal Grandmother's testimony was disproportionally in support of her daughter, despite professional evidence that contradicted her own. Though Mother has not been drug tested

29

since the previous termination hearing, she was sporadically testing positive for amphetamines, to which Mother claimed she had a prescription[5]. Further, Mother stated that she self-medicated with marijuana until approximately four months ago.

Due to the lack of sustained progress in the year-and-a-half prior to the March, 2015 termination, and the failure of Mother to remedy the conditions in the year and three months since the hearing, the Court cannot determine that Mother can or will remedy the conditions that render her incapable of providing S.K. with the essential parental care and subsistence that he requires. Though the Court does not hold against Mother the time since the last termination hearing for purposes of showing love and affection to the child, we note that Mother still has not shown the stability necessary to alleviate the stressors that exacerbate her disorder, and substantially more concerning, she has completely abandoned any assistance in dealing with her disorder, nor has she shown an ability to remedy the enumerated concerns. Though the Court notes the environmental concerns continuing to exist, we make the finding that remedying the environmental concerns are not beyond her control. Despite having significant funds from a tax refund, and assistance from the Agency, Mother refused to prioritize housing for her child. Therefore, the Court cannot, from the credible evidence presented, speculate as to when Mother may have enough stability to render her capable of independently providing S.K. with the care he needs. It is clear that Mother's failure to address her own mental health needs has caused her, and will continue to cause her, to neglect the child's needs. Mother has been unable to establish that she is capable of raising the child

---

[5] Jill Egbert from the Agency testified that Mother claimed to have a prescription for Adderall, that Adderall would result in a positive test for amphetamines, that Mother never provided a prescription, and that there is no record of the prescription being verified. Hr'g Tr. 17: 1-20 (July 5, 2016).

30

on her own, or that she has sufficient community support. Further, when Mother was offered assistance to budget and other service, she failed to successfully complete goals. While she relies upon churches and good will for cash assistance, she is unable to utilize assistance for long term management or parenting. Though Maternal Grandmother testified in support of her daughter, her testimony lacked any credibility, particularly against the weight of the evidence that supports termination.

Therefore, based on the credible evidence presented, the Court finds that termination of Mother's parental rights pursuant to Section 2511(a)(2) is appropriate. A detailed discussion of Section 2511(b) appears hereunder.

### Section 2511(a)(5)

S.K. has undeniably been in placement in excess of six months. S.K. was adjudicated dependent on August 20, 2013; the termination petition was filed December 16, 2014, at which time S.K. was in placement for approximately sixteen months. At the time the hearing occurred on the petition related to Mother, S.K. had been in placement for approximately eighteen months. Now, as of July, 2016, S.K. has been in placement for nearly three years, though the Court does note that approximately one year of that time was during the appellate period.

S.K. was removed from Mother's care and initially put in placement on an emergency basis due to a significant safety concern. Mother was involuntarily hospitalized after an incident where Mother left S.K. with a stranger while she took another person's injured dog to

31

receive veterinary care. S.K. was placed in foster care due to concerns regarding Mother's mental health, instability, lack of housing and employment, and drug use.

Mother has been unable to obtain and maintain employment for any extended period of time; most of her employment is in the food service industry and she has not lasted more than a few weeks at any of these positions. At the time of the hearing, Mother had only been employed at a job she considers stable for approximately ten weeks. She reported prior employment at restaurants throughout York County, and some of those jobs were verified by the caseworker, but she did not work at any of those jobs for any significant, consistent period of time. Mother testified that she previously received income from performing some form of spiritual work, but the few receipts Mother has provided were self-made, and none were recent.

Mother asserted that she continued to use marijuana until recently, though it has been unable to be verified whether she has truly stopped using drugs. Mother had stopped cooperating with drug testing, arguing that it violated her constitutional rights. The Court therefore cannot determine Mother's use of drugs is no longer a concern, and even by Mother's own admissions, any cessation in drug use is extremely recent.

Most notably, significant concerns regarding Mother's mental health continue to exist. Ms. Hill testified that individuals with Mother's diagnoses are impulsive, make snap judgments, and have difficulty processing information and prioritizing tasks. Additionally, Ms. Hill testified that Mother has evidenced a lack of time management skills and impulsiveness, which makes parenting a child far more difficult. The Court has also seen

32

Mother demonstrate those very behaviors. Mother frequently appeared late to hearings, appointments, and to visits throughout the child's adjudication.

Mother also has difficulty controlling her behavior, particularly, as pointed out by Ms. Hill, during periods of stress. Mother still has not remedied many of the concerns that cause her stress and, far more concerning to the Court, she has not been communicating with Ms. Hill or any other counselor or therapist. Because Mother has not been addressing her mental health concerns at all, and has simply been ignoring the existence of those concerns, safety concerns still exist. Further, Ms. Hill believes Mother has an ongoing need for therapy, in which Mother chooses not to engage. Though Mother indicates that she would be willing to participate in counseling, there has been no follow through by Mother, which is consistent with the concerns expressed by Ms. Hill regarding how Mother's mental health would impact the child. Mother's disinterest in therapy is clear, as once Ms. Hill had to cancel one appointment due to an emergency, Mother chose not to contact her again.

At this time, Mother is still unable to provide S.K. with stable housing suitable for reunification and whether she could do so within a reasonable amount of time is unclear. Though Mother has had housing that may have been appropriate for the child, Mother never remained at one residence long enough to achieve reunification. She has been in-and-out of a number of motels and friends' homes for most of the months S.K. has been in placement. Though the Court notes that the Superior Court has previously stated that "the rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing, and medical care if found to be beyond the control of

33

the parent," this Court finds that many of these issues were not beyond Mother's control. *In re: D.W.*, 856 A.2d 1231 (Pa.Super. 2004). The sizeable tax return of approximately $7,000 Mother received in 2014 could have been used to secure stable housing. Further, the Court is not making this determination based solely on environmental factors. The Court finds that Mother's failure to prioritize these environmental factors is merely a symptom of the much larger problem of her general neglect and denial of her mental health concerns.

Services or the assistance of the Agency will not assist Mother in remedying these concerns within a reasonable period of time. Mother has been provided with services, but she chose not to utilize those services or cooperate with them in any meaningful way. When the Justice Works team terminated services in September 2014, after nearly a year of providing assistance, Mother had not made substantial progress toward achieving many of the goals set forth for her. Though Mother says she would now work with a team, based on Mother's history of noncompliance, there is no indication to the Court that if a Justice Works team was assigned to work with Mother at this point in time that she would cooperate in any substantial way or for any substantial period of time. Mother additionally has unrealistic expectations of her income and stability, as evidenced by her assertion that a job she has held for less than three months is stable.

It would take Mother an unknown and unreasonable period of time to achieve and maintain stability sufficient to support her reuniting with S.K. The child has already been in care for the majority of his life. The termination of Mother's parental rights best serves S.K.'s needs and welfare, as further outlined below. While Mother has continued to associate with

34

S.K. consistently throughout S.K.'s adjudication of dependency, S.K.'s daily needs have been met by his foster mother, to whom he has a significant bond.

### *Section 2511(a)(8)*

Indisputably, S.K. has been in placement in excess of twelve months. From the time of S.K.'s adjudication on August 20, 2013 until the time the petition on December 16, 2014, S.K. was in placement for approximately sixteen months. He has now been in placement nearly three years. Though the Court does not hold the year-long appellate period against Mother for purposes of Section 2511(a)(1), the Court notes that that the appellate period afforded Mother the opportunity to remedy the conditions that led to the removal of the child. She has chosen to abandon her treatment and has not evidenced an ability or willingness to remedy the safety concerns that have caused the child to be out of her care for those three years.

S.K. was removed from Mother's care and initially put in placement on an emergency basis due to a safety concern. Mother was hospitalized pursuant to a 302 hold after an incident where Mother left S.K. with a stranger while she took an injured dog to receive veterinary care. S.K. was placed in foster care at the time of his adjudication because Mother was not a resource at the time of the adjudication, due to concerns regarding Mother's mental health; instability, particularly in the areas of housing and employment; and drug use. Although she may have at times made progress toward some of her goals or has been mostly cooperative with services provided, the concerns that necessitated placement have not been alleviated and the placement of S.K. continues to be necessary.

Even if the Court would accept that Mother has remedied the housing and employment concerns, there is no indication that she can sustain either. Furthermore her unwillingness to treat her mental health, other than with marijuana, places S.K. at risk for neglect if returned to her care. Additionally, as previously noted, Mother's mental health continues to be a concern. Mother, at this point in time, has completely abandoned any mental health treatment, and denies having any mental health concerns. Mother has also declined the agency's request for a mental health evaluation. Mother's analysis of her own mental health is clearly misguided, as her counselor stated that at Mother's last therapy session, it was clear that she remained in need of further treatment. She additionally refuses to take any medication, and even when she was taking medication, her actual usage was sporadic at best, as evidenced by drug screens that were negative at times. Mother did state, however, that until recently she continued to use marijuana for therapeutic purposes, despite knowing it was illegal to do so.

The Court does not find credible that Mother is now in stable housing, or that she is employed in a stable job. Mother has not verified that she has consistently paid her rent in her new apartment, and further, it was found by the Agency to not be suitable for the child. Though Mother states that she may possibly be able to remedy the issue by renting another apartment once renovations are complete, this is a speculation by Mother. Further, Mother has a history of speculating as to how she may remedy a problem, and failing to actually do so. Additionally, though Mother does currently have employment, she has also not verified her actual monthly income, and by her own admission, she has only been working at the current position for approximately ten weeks. Given Mother's history of securing

36

employment prior to meetings and court hearings, and losing those jobs shortly thereafter, and also taking into account Mother's intermittent work history, it is difficult to speculate whether this is a job Mother might actually be able to maintain for a significant period of time.

Further, even if Mother can maintain employment, it is not likely that she will be in a position to pay all of her expenses, especially in the event that the child is returned to her care. There has been no evidence presented that she has an income sufficient to sustain the expenses associated with basic living, let alone with raising a child. Though Mother believes she is not spending more than she is making, she has shown that she is without the understanding to truly evaluate budgetary needs. Mother demonstrated her lack of comprehension of money management when she spent part of a $7,000 tax refund on her "self-employment" as opposed to securing stable housing. Furthermore, despite her history, she believes that she can budget by memory just by knowing her income.[6]

Lastly, the termination of Mother's parental rights best serves S.K.'s needs and welfare. While Mother continued to visit with S.K. consistently until approximately May, 2015, S.K.'s daily needs have been met by his foster mother since 2013. Ms. Brooks is the individual who makes medical appointments for S.K. and, although Mother has sometimes attended those appointments, it is Ms. Brooks that takes him. Additional consideration as to whether termination is in S.K.'s best interest is detailed in Section 2511(b).

---

[6] At the re-hearing on July 7, 2016, Mother testified that her budget was simply an account of all of her expenses, but she did not provide that as evidence, and she stated she had it at her house. Hr'g Tr. 259: 7-25. (July 7, 2016).

## Section 2511(b)[7]

Neither expert testimony nor a formal bonding assessment is required for consideration under this subsection of the Adoption Act. See In re N.A.M., 33 A.3d 95, 103 (Pa.Super. 2011). The Court can consider the testimony that was presented by caseworkers and other witnesses in making the determination whether termination would best suit S.K.'s developmental, physical, and emotional welfare. See generally id.

Mother's feelings of love and affection for S.K. do not prevent termination of her parental rights. See In re Z.P., 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted). Moreover, the mere existence of a bond, if the Court did find credible evidence supported such a finding, does not preclude termination. See In re N.A.M., 33 A.3d at 103. While there may have been a bond between S.K. and Mother, there is credible evidence that he has a far stronger bond with his foster Mother. Further, evidence was presented that when S.K. was having visits with his Mother, he frequently did not want to attend those visits.

The Superior Court has stated that "no bond worth preserving is formed between a child and a natural parent where the child has been in foster care for most of the child's life, and the resulting bond with the natural parent is attenuated." In re K.H.B., 107 A.3d 175, 180 (Pa.Super. 2014)(citing In re K.Z.S., 946 A.2d 753, 764 (Pa.Super. 2008)). By the time the termination petition was filed in December 2014, S.K. was three years old; he had been in placement with Ms. Brooks since he was less than twenty months old. He has been with Ms.

---

[7] Any facts as they relate to Mother's attempts to remedy conditions after the filing of the petition in October 2014 were considered only as this section relates to Section 2511(a)(2) and (a)(5). Despite the directive in Section 2511(b), the Court did consider efforts by Mother after the petition was filed in determining that termination is still in the best interest of S.K. pursuant to Section 2511(a)(8).

Brooks for the majority of his life. Ms. Brooks is the individual who cares for S.K. on a daily basis, he now refers to her as "Mommy". Ms. Brooks has provided S.K. with the safe, stable environment Mother has not demonstrated she has the ability to offer him.

Ms. Brooks has cooperated with the Agency and ensured continued contact with the child's biological family. She has accommodated maternal grandmother, and has facilitated ongoing family contact and fostered the biological connection for the child. It is clear that Ms. Brooks is looking out for the best interest of the child, that he always comes first, and that she ensures that he sees his maternal grandmother and other family members, even though it may be contrary to her own interests.

This Court is constrained to follow the law, and under 23 Pa. C.S. § 2511, the Agency has met its burden by clear and convincing evidence. Giving primary consideration to the developmental, physical, and emotional needs and welfare of S.K., the Court has found credible evidence exists to support termination of Mother's rights pursuant to both Section 2511(a) and Section 2511(b), and the Court does GRANT the petition filed by the Agency.

## CONCLUSIONS OF LAW

1. The Agency has failed to establish by clear and convincing evidence that Mother has either demonstrated a settled purpose to relinquish her parental rights or has failed to perform parental duties on behalf of S.K. for at least six months prior to the filing of the petition. 23 Pa. C.S. § 2511(a)(1).

2. The Agency has established by clear and convincing evidence that the incapacity, neglect and refusal of Mother has caused S.K. to be without essential parental care, control or

subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, neglect and refusal cannot or will not be remedied by Mother. 23 Pa. C.S. § 2511(a)(2).

3. The Agency has established by clear and convincing evidence that S.K. was removed from the care of Mother for a period in excess of six (6) months and has since remained in placement. The circumstances which led to S.K.'s placement continue to exist and Mother cannot or will not remedy these conditions within a reasonable period of time and the services or assistance available to Mother are not likely to remedy the conditions within a reasonable period of time. Furthermore, the termination of parental rights is in S.K.'s best interest. 23 Pa. C.S. § 2511(a)(5).

4. The Agency has established by clear and convincing evidence that S.K. was removed from Mother's custody more than twelve months prior to the filing of the termination petition and that the circumstances that necessitated placement continue to exist. Furthermore, the termination of parental rights is in S.K.'s best interest. 23 Pa. C.S. § 2511(a)(8).

5. Termination of Mother's parental rights will best serve S.K.'s needs and welfare. 23 Pa. C.S. § 2511(a)(5); 23 Pa. C.S. § 2511(a)(8); 23 Pa. C.S. § 2511(b).

Dated: 9/2/16

BY THE COURT,

_____
ANDREA MARCECA STRONG, JUDGE

40

# IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
## ORPHANS' COURT DIVISION

In Re:   Adoption of:          :
       S.K.                     :
             A Minor       :    No. 2014-0180
                               :    Termination of Parental Rights

APPEARANCES:

Martin Miller, Esquire                  Daniel D. Worley, Esquire
Office of Children, Youth & Families     *Guardian Ad Litem*

Edward R. LeCates, Esquire
Counsel for Appellant

## OPINION PURSUANT TO
## PENNSYLVANIA RULE OF APPELLATE PROCEDURE 1925

AND NOW, this 28th day of October, 2016, the Court is in receipt of the

Notice of Appeal and Concise Statement of Matters Complained of on Appeal

filed by A.K. (hereinafter referred to as "Appellant"), pursuant to Pennsylvania

Rule of Appellate Procedure 1925, the Court does hereby adopt its Adjudication

filed on September 6, 2016 as the place on the record where the reasons for the

decision are found and supplements as follows:

1

This Court considered the credible evidence presented at the evidentiary hearings held on July 5 and 7, 2016, and the evidence admitted into the record. Appellant argues the Court erred in concluding she was not credible. Although the Court agrees that compared to Appellant's past appearances, Appellant appeared more focused, the Court still finds that Appellant's testimony and evidence lacked credibility. Although her ability to present her issues has improved, the Court found the evidence presented was not sufficient to overcome the overwhelming evidence against her.

Appellant also argues that the Court erred in concluding she was not forthcoming with information. Appellant has not been compliant with submitting requested information throughout the dependency proceeding as well as at the termination proceedings. Appellant consistently failed to produce or timely submit documentation supporting her claims of stability to the team, caseworker, counsel or the Court. Additionally, after refusing to submit documentation, though she claimed that she could make it readily available, she attempted to improperly introduce evidence at trial – without having submitted it to any party, and without authentication or qualification that the document was admissible.

Appellant argues that the Court erred in finding her non-compliant with the Agency. The Court found that Appellant "evidenced that she is unwilling to fully cooperate with any services designed to assist Appellant in the reunification effort." (Op. at 28.) The Court notes that this finding of non-compliance with services applies particularly to §2511(a) (5) and supports the finding that services reasonably available to appellant will not remedy the conditions due to Appellant's refusal to utilize those services. It is Appellant's failure to provide credible evidence of her circumstances that further supports the finding that Appellant was non-complaint with the Agency.

Appellant also argues the Court erred in concluding she had not maintained stable housing and employment. Extensive testimony was provided that Appellant remains unable to maintain stable housing and employment for any significant length of time, even though maintaining stable housing and employment have consistently been identified goals throughout the entire dependency proceedings. At the hearing, evidence was presented that Appellant has been at her employment for only approximately 10 weeks, had been unemployed for approximately 8 months prior to that, and was unable to produce pay stubs to evidence income from any other time. (Op. at 20.)

3

Additionally, Appellant has had at least fourteen housing changes throughout the dependency proceeding. Appellant unreasonably argues that her erratic employment situation and constant housing change exhibits stability in housing and employment.

As to Appellant's lack of reliable transportation, Appellant stated that her vehicle was still not properly registered, insured, or inspected. (Hr'g Tr. 17: 1-20, July 5, 2016). Appellant herself claimed transportation issues as the reason Appellant was often late or cancelled appointments, and the Court noted that Appellant would often be late to appointments, or cancel appointments entirely, despite readily available public transportation. (Op. at 19.) The Court found in the evidence presented that Appellant has not shown an ability to utilize the readily available transportation consistently to attend appointments.

S.K.'s bond with Maternal Grandmother is of no moment to the issue decided by the Court. Maternal Grandmother is not the foster parent. The Court gave primary consideration to the developmental, physical and emotional needs and welfare of the child. Of consequence is the Court's finding that the S.K. has a strong bond with his foster mother. Any post adoption contact between the child and his biological family is not considered in the context of

4

termination of Appellant's parental rights. Similarly, Maternal Grandmother's testimony was simply unbelievable and inconsistent with her position regarding Appellant in the underlying dependency proceedings. Maternal Grandmother presented self-serving testimony in an apparent effort to garner favor with her daughter to continue a relationship with the child had Appellant's rights not have been terminated.

Appellant also argues that the Court erred in concluding that she lacks sufficient community support and that the Court erred in concluding Appellant had not made substantial progress with JusticeWorks. The Court found that although Appellant has relied upon churches and good will for cash assistance in the past, she failed to establish credible evidence that she was capable of supporting herself and S.K. capably and dependably. In regards to the JusticeWorks involvement, the JusticeWorks team closed out on September 2014 unsuccessfully as it was determined that Appellant could not make further progress. (Op. at 18.) It was noted that while Appellant would have positive supervised visits with S.K., she was unable to progress to unsupervised visitation. (Op. at 17.) The Court found the evidence presented by the team was

5

credible and supported the finding that Mother failed to make substantial progress and frequently made minimal progress on major goals set forth for her.

The Court also found there was no credible evidence presented to support any correlation between inactive ingredients in Adderall and improved stability and behavioral issues as argued by Appellant. As outlined above, Maternal Grandmother's biased presentation lacked credibility and Ms. Hill's observations of Appellant's appearance immediately prior to the court hearing, fails to support that Appellant has adequately addressed her significant mental health concerns.

The Court found that the Agency did establish by clear and convincing evidence that Appellant's parental rights should be terminated under §2511(a)(2)(5) and (8) because Appellant did not demonstrate that the conditions which led to the child's placement are being remedied. We noted that while there was evidence that supported a finding that Appellant made *some* steps towards improving her circumstances since the adjudication of the child, there was also credible evidence which indicated that Appellant could not, in the forseeable future, remedy the situation which led to S.K.'s placement. The Court found that it would not be in the best interest of S.K. to wait any longer than the

6

three years in which he has already been in placement for Appellant to provide him with stability.

Based on reliable and credible evidence that demonstrated Appellant's continuing pattern of inability to remedy the situations that led to the placement of S.K., the Court found that clear and convincing evidence indicated that termination of parental rights was appropriate and in the best interests of the child.

Competent evidence on the record supports the outcome.

**BY THE COURT,**

ANDREA MARCECA STRONG, Judge

7